```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF INDIANA
                FORT WAYNE DIVISION
```

ROBERT ELLIOTT, et al.,     )
                            )
Plaintiffs,                 )
                            )
vs.                         )    NO. 1:11-CV-154
                            )
STATE FARM FIRE AND         )
CASUALTY CO.,               )
                            )
Defendant.                  )

## OPINION AND ORDER

This matter is before the Court on State Farm Fire & Casualty Company's Motion for Summary Judgment, filed on March 14, 2013. For the reasons set forth below, this motion is **GRANTED IN PART and DENIED IN PART**. To the extent State Farm seeks summary judgment on Plaintiffs' bad faith claim, this motion is **GRANTED**. Accordingly, Plaintiffs' bad faith claim is **dismissed**. To the extent State Farm seeks summary judgment on Plaintiffs' breach of contract claim, this motion is **DENIED**.

BACKGROUND

On April 12, 2011, Plaintiffs, Robert and Elizabeth Elliott, filed a complaint against their insurer, Defendant, State Farm Fire and Casualty Company ("State Farm"), alleging breach of contract and bad faith arising out of State Farm's investigation and

-1-

ultimate denial of the Elliotts' homeowners insurance claim.

On March 14, 2013, State Farm filed the instant motion for summary judgment, arguing there is no material question of fact with respect to either claim, and that State Farm is entitled to judgment as a matter of law on both.

Facts

At all times relevant, Plaintiffs resided at 5152 East 1050 North, Ossian, Indiana ("the property"). They procured a homeowner's insurance policy for that property through State Farm, covering damage to the dwelling, damage to its contents, and loss of use. The policy issued to Plaintiffs provided, in part:

> SECTION I AND SECTION II - CONDITIONS
>
> ***
>
> 2. CONCEALMENT or FRAUD. This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

On August 31, 2009, Plaintiffs' dwelling and contents located at the property were damaged by fire. As a result, Plaintiffs submitted a claim to State Farm for the damage to their dwelling and personal property. This claim was assigned to State Farm Claims Representative, Monica Miller. After receiving the assignment, Miller made contact with Plaintiffs and scheduled a

meeting with them regarding the loss.

During their meeting, Miller provided the Elliotts with a red binder, along with personal property inventory forms. They reviewed the applicable insurance coverage, the personal property forms and Miller explained how to complete those forms. Miller informed the Elliotts that they could call her with questions. Miller told the Elliotts they could return the completed forms to State Farm via fax, mail, or in person through their agent. Miller did not ask Mr. Elliott whether he or Mrs. Elliott had any previous experience filling out personal property inventory forms. Mr. Elliott was unsure of how to value some items. Miller informed him that he should do the beset he could in estimating the value on the personal property forms. Miller did not inform Mr. Elliott that certain items may be covered at market value rather than replacement value or that he should get an appraisal of the items. The Elliotts spent hours completing the personal property inventory forms and submitted the completed forms to Gail Gibson at their insurance agent's office. The Elliotts believed that the personal property inventory forms were accurate when they submitted them to State Farm, and they submitted them with the intent that State Farm would rely on them as being truthful and accurate.

The first set of personal property inventory forms submitted to State Farm by the Elliotts were dated October 29, 2009, and consisted mainly of food items lost in the fire. The Elliotts

submitted their second set of personal property inventory forms to State Farm on October 30, 2009. Two oriental rugs - Items 303 and 304- were listed on this second set of inventory forms. Mrs. Elliott did not have the receipts for these rugs when filling out the inventory forms. Mrs. Elliott listed what she thought she had pair for each rug, which was $7,500 and $10,000, respectively.

After the second set of inventory forms were submitted to State Farm, Mrs. Elliott contacted Ethan Allen, seeking receipts from the purchase of the rugs. Ethan Allen mailed copies of the receipts to Mrs. Elliott. When Mrs. Elliott opened the envelope, there were handwritten numbers on the receipts next to some of the dollar amounts. She showed these receipts to Mr. Elliott. Mrs. Elliott believed the values shown on the receipts - that included the handwritten numbers in blue ink - were accurate. The receipts also listed a third rug that Mrs. Elliott forgot to put on the previously submitted two sets of inventory forms.

On November 17, 2009, Mrs. Elliott submitted a third set of personal property inventory forms to State Farm, including the third rug damaged in the fire. Mrs. Elliott listed the value of that rug at $11,849, which was the price listed on the receipt she received in the mail from Ethan Allen. The receipts the Elliotts received from Ethan Allen were submitted to Miller at State Farm.

Miller believed that the receipts appeared to be altered in that the prices of the rugs contained extra digits written in blue

ink. For example, the typewritten price of an item on one receipt was $149, but the receipt submitted to State Farm showed an extra digit added to the receipt in blue ink so the price was listed as $1149. According to the Elliotts, the blue ink written numbers were on the receipt when they received it in the mail from Ethan Allen. Moreover, Mrs. Elliott initially believed the receipt was related to one of the damaged oriental rugs, but later learned that it was a receipt for a picture.

In addition, the typewritten price of an item on one receipt was $849, but the receipt submitted to State Farm showed extra digits added in blue ink to make the price listed as $11,849. Here, too, the Elliotts stated that the blue ink written numbers were on the receipt when they received it from Ethan Allen. The Elliotts later visited the Ethan Allen store, where they were provided with a receipt without blue ink, showing the price was $849.

Third, the typewritten price of another rug from Ethan Allen was $311.20, but the receipt submitted showed extra digits added to the receipts in blue ink so the price was listed as $11,311.20. The Elliotts assert the blue ink-written numbers were on the receipt when they received it in the mail from Ethan Allen. When Ms. Elliott received the receipt in the mail from Ethan Allen, she believed the price listed - including the blue ink - was accurate. Again, Mrs. Elliott was not aware of the inaccuracy until they

received a receipt without blue ink from Ethan Allen during a subsequent visit to the store.

Once Miller received the receipts from the Elliotts, she spoke with her team manager and they consulted Charles Korensky, a claims representative for State Farm. Miller told Korensky that she was meeting the Elliotts the following day regarding their contents claim. Korensky indicated he would try to attend the meeting.

On November 19, 2009, the Elliotts met with Miller and Jim Moses regarding their personal property losses. After the meeting, the Elliotts were taken to a conference room, where they met Korensky. Korensky told them he was there to take their recorded statements. Korensky did not identify himself or explain the purpose of the recorded statement. The Elliotts told Korensky they did not want to go forward with the recorded statement; however, the Elliotts felt like they had no choice but to allow Korensky to take their statement. Korensky went forward with taking their statements.

The Elliotts understood that they had an obligation to be truthful during the recorded statement. The recorded statement took approximately one hour. At the time of the recorded statement, Mrs. Elliot was seven weeks from having back surgery and was on pain medication. She also felt intimidated by Korensky and she was brought to tears. Mr. Elliott got upset because of how Korensky was treating them. The Elliotts asked to stop the

recorded statement, but Korensky told them it could result in the denial of their insurance claim.

During the recorded statement, Mrs. Elliott stated that she purchased the three rugs at issue in 1997 and 1999, prior to her marriage to Mr. Elliott on April 5, 2008. Mrs. Elliott reviewed the personal property inventory forms and was asked about item no. 304, which is listed as an 8' x 10' rug purchased from Ethan Allen eight years prior for $10,000. Mrs. Elliott stated that she wrote on the personal property inventory form that the cost of the rug was $10,000, but the actual cost of the rug was $11,311. Mrs. Elliott stated that the actual cost of the 8' x 10' rug was documented on the receipt from Ethan Allen. Mrs. Elliott stated that she and her ex-husband paid for the 8' x 10' rug with cash that she had obtained from a 1992 accident settlement.

Mrs. Elliott acknowledged that the receipts she received from Ethan Allen had handwritten numbers on them; however, she was unsure who put the handwriting on the receipts. She believed the receipts from Ethan Allen were accurate and that she paid approximately $12,000 for the oriental rug listed as number 304 on the personal property inventory form. Mrs. Elliott stated that the receipts from Ethan Allen were presented to the insurance agent exactly as they were received by the Elliotts from Ethan Allen.

During the recorded conversation, the Elliotts were asked about a second rug listed on the personal property inventory forms

as valued at $7,550. Mrs. Elliott stated that, after she filled out the forms, she received the receipt from Ethan Allen showing the rug was worth $1,149. That prompted Mrs. Elliott to change her requested value of the rug to $1,149.

Mrs. Elliott was asked about the third rug listed on the forms. Mrs. Elliott recalled paying almost $12,000 for it, making a down payment with a Visa card and paying the rest off with cash. At that time, based on the receipts she had from Ethan Allen, Mrs. Elliott believed that she had paid $11,849 for the rug.

Mr. Elliott first learned the prices paid for the three oriental rugs after they were damaged in the fire. He found out the value of two of the rugs when they were listed on the inventory forms. The third rug was not initially listed on the inventory forms. He learned the value of the third rug when he saw the receipts and the amount for the third rug later listed on the personal property inventory form. He was surprised to learn that the three rugs had cost over $25,000. Mrs. Elliott completed the personal property inventory forms and Mr. Elliott signed them before they were submitted to State Farm.

Mrs. Elliott stated that she did not think there was anything unusual about handwriting on the receipts because she knew that the handwriting amounts were consistent with the amounts she had paid for the rugs.

After the recorded statement, Korensky had concerns regarding

the documents submitted by the Elliotts because the documents appeared to have been altered. Korensky was unsure if the prices on the altered documents reflected the actual purchase prices. Korensky went to the Ethan Allen store and requested a copy of the original receipts for the rugs. Ethan Allen employee, Alex Klausing, provided copies of the receipts to Korensky. The copies of the receipts for the rugs provided by Ethan Allen were not consistent with the documents presented by the Elliotts; there were no ink written numbers on the receipts obtained directly from Ethan Allen. On November 19, 2009, Korensky sent an e-mail to his Team Manager, Michael Thomas, requesting that the Elliotts' claim be assigned to the Special Investigations Unit. Korensky told Mrs. Elliott that the copies of the receipts he received from Ethan Allen were different from the copies the Elliotts provided to State Farm.

On November 20, 2009, Korensky sent a reservation of rights letter to the Elliotts stating that there was a question whether the Elliotts had made a material misrepresentation regarding the claim.

On February 24, 2010, State Farm took the examination under oath of the Elliotts. During her examination, Mrs. Elliott stated that the rug values listed on the personal property inventory forms and accompanying receipts were not correct and that the proper values were listed on the estimate prepared by Aaron's Oriental

Rugs, which valued all three rugs at $6,800. Mrs. Elliott agreed to accept the appraised value of the rugs. Mrs. Elliott explained that her previous statements to State Farm regarding the cost of the rugs and the information she provided on the inventory forms were based on her memory and the receipts she received in the mail from Ethan Allen.

After the examination under oath, Korensky investigated the Elliotts' financial situation. Korensky confirmed that the Elliotts maintained separate bank accounts. Korensky and Thomas worked together in preparing the claim recommendation memorandum. They recommended that State Farm deny the claim and void the policy based upon a breach of the concealment or fraud provision of the policy. Korensky and Thomas believed the Elliotts were not credible and that the evidence clearly showed that the Elliotts submitted documents to State Farm which had been altered in an effort that State Farm would rely on them. State Farm concluded that the Elliotts intentionally concealed and misrepresented facts surrounding their claim and sent a letter denying coverage.

State Farm issued payments to the Elliotts up until the date that State Farm questioned the Elliotts coverage. State Farm issued payment to or on behalf of the Elliotts in the amount of $62,631.62 for building repair, $58,624.29 for cleaning and replacement of contents, and $5,750.64 for living expenses. State Farm did not pay the full amount of the Elliotts' claim and there

is more than $100,000 in outstanding claims.

State Farm's counsel took the depositions of Ethan Allen employees Alex Klausing and Stacie Fackler. Ms. Fackler is a customer service specialist and has worked at Ethan Allen since June of 2009. Ms. Klausing works in design sales and has worked for Ethan Allen for approximately 18 years. When Mrs. Elliott initially called Ethan Allen looking for receipts, she spoke with Alex Klausing. Ms. Fackler then made photocopies of the receipts, placed the photocopies in an envelope with Mrs. Elliott's name on it, and put the original receipts back in a folder.

Ms. Fackler and Alex Klausing were at store when both Mr. And Mrs. Elliott came into Ethan Allen asking for another copy of the receipts. Mrs. Elliott showed Ms. Fackler the receipt she needed a copy of. Ms. Fackler recalled that there was ink written in front of the totals, but noticed that the tax amount on the receipt did not change to reflect the taxable amount of the total that would include the ink written numbers. Ms. Fackler recalls that, during this visit, the Elliotts and Ms. Klausing discussed who made the written marks on the receipt. During the conversation, Mr. Elliott asked Mrs. Elliott if she altered the receipts, which Mrs. Elliott denied.

Ms. Fackler stated she was the only person who touched the photocopies sent in the mail to the Elliotts and that she did not make any changes to the receipts. Ms. Klausing also stated that

-11-

she did not alter the receipts and is not aware of anyone from Ethan Allen writing on any of the receipts.

DISCUSSION

Summary Judgment Standard

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met

this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at trial, summary judgment will be appropriate.


The breach of contract claim is not appropriate
for summary judgment because there is a question of fact
<u>the as to whether the Elliotts intended to deceive State Farm.</u>

The Elliotts have brought a breach of contract claim against

State Farm due to State Farm denying their insurance claim. State Farm argues that it is entitled to summary judgment on this claim, arguing State Farm satisfied all of its obligations for payment and properly denied the Elliotts' claims in accordance with the terms and conditions of the insurance policy. Simply put, State Farm asserts that the Elliotts breached the "Concealment of Fraud" provision of the insurance policy, which voided the entire policy; therefore, there is no coverage under the insurance policy.

The interpretation of an insurance policy is generally a question of law appropriate for summary judgment. *Liberty Mut. Ins. Co. v. Michigan Mut. Ins. Co.*, 891 N.E.2d 99 (Ind. Ct. App. 2008). As an insurance policy is reviewed under the same interpretation as other contracts, if the language of the policy is clear and unambiguous, then this Court will apply the plain and ordinary meaning. *Id.*

Again, the "Fraud or Concealment" provision provides, that the insurance policy is void if any "insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss." State Farm submits that this provision voids out the Elliotts insurance policy because the Elliotts intentionally misrepresented the purchase price of three oriental rugs damaged in the fire. It is true that the Elliotts submitted altered invoices to State Farm that misrepresented what the Elliotts paid for the

three rugs. It is also true that during a recorded statement, Mrs. Elliott affirmed the incorrect amounts listed on the submitted invoices. Moreover, Mrs. Elliott also stated that the handwritten amounts on the receipts were consistent with what she believed she had paid for the rugs. Thus, it is undisputed that the Elliotts misrepresented the price they paid for the oriental rugs. However, merely misrepresenting a material fact does not void the policy. The policy is only voided when the misrepresentation is intentional.

The Seventh Circuit has taught that "summary judgment ought to be used sparingly and with great caution in cases . . . where subjective intent is a factor in the determination. *Alexander v. Erie Ins. Exchange*, 982 F.2d 1153, 1160 (7th Cir. 1993). Only when the undisputed facts make the outcome clear, can summary judgment be appropriate. *Id.* Such is not the case here. The issue of intent is mired in disputed facts that will depend heavily on the credibility of the witnesses. For example, although the Elliotts admittedly submitted altered receipts to State Farm, the Elliotts claim that they believed the receipts were accurate when they submitted them to State Farm. The Elliotts claim that the receipts they submitted to State Farm were in the exact same condition as they were when the Elliotts received those receipts in the mail from Ethan Allen. While the Elliotts do not know wrote the numbers in ink, they state that they did not do it. Moreover, the Elliotts

-15-

claim to have relied in good faith on the receipts received from Ethan Allen. While Mrs. Elliott orally misrepresented what she paid for the rugs to State Farm, she stated that she believed she had paid for the rugs an amount that was listed on the altered receipts. It is worthy to note that, during this time, Mrs. Elliott was on prescribed pain medication following a back surgery, which she states affected her memory. Thus, while Mrs. Elliott does not deny providing inaccurate information to State Farm, there is a genuine issue of material fact as to whether the Elliotts intended to deceive State Farm. As such, summary judgment is not appropriate.

The bad faith claim is appropriate for summary
<u>judgment because there exists no genuine issue of material fact.</u>

The Elliotts have also brought a bad faith claim against State Farm, alleging State Farm breached its duty of good faith and fair dealing with regards to its investigation and denial of the Elliotts' claim. State Farm argues it is entitled to summary judgment on this claim, arguing there is no evidence that State Farm acted in bad faith in its handling and ultimate denial of the Elliotts' claim.

Indiana law recognizes that there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured. The failure to comply with a duty to act in good faith is often called the tort of bad faith and was first

recognized in *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515 (Ind. 1993). In *Erie*, the Indiana Supreme Court observed that:

> The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim.

Id. at 520.

Obviously, a cause of action will not arise every time an insurance claim is denied. A good faith dispute about whether the insurer has a valid claim will not supply the grounds for recovery in tort for the breach of the obligation to exercise good faith. *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 40 (Ind. 2002). However, an insurer that denies liability knowing there is no rational, principled basis for doing so has breached its duty. *Id.* To prove bad faith, the plaintiffs must establish, with clear and convincing evidence, that the insurer had knowledge that there was no legitimate basis for denying liability. *Id.*

The Elliotts claim that State Farm engaged in bad faith in investigating the claim and in denying the claim. The Elliotts assert State Farm improperly denied their insurance claim because the Elliotts valued the rugs on their best memory and did not intentionally misrepresent the value. The Elliotts also allege that State Farm's investigation was in bad faith by "an intentional undertaking by State Farm to build a case to support the denial of

Mr. and Mrs. Elliott's claim." The Elliotts take issue with way Korensky conducted the recorded statement, complaining that they did not have prior notice of it, that Korensky was intimidating, and that Korensky told them their claim may be denied if they refused to proceed with the recorded statement. They also complain that Korensky never inspected the rugs at issue or got an independent appraisal. And, they further complain that Korensky took Mrs. Elliott's examination under oath despite being told that she was on pain medication that could affect her memory. Lastly, the Elliotts believe bad faith exists because the Claim Recommendation Memo did not mention Mrs. Elliott was on pain medication that could affect her memory and did not presume that the incorrect amounts listed for the oriental rugs could have been the result of poor memory.

Despite the Elliotts' complaints, they have not shown that a genuine issue of material fact exists regarding their bad faith claim. To start, there is nothing to show that State Farm engaged in bad faith when it denied the Elliotts' claim. When State Farm received altered receipts from the Elliotts, they conducted an investigation, and allowed the Elliotts to explain the altered documents. Whether State Farm was correct in denying the claim remains for trial. However, because State Farm had a good faith basis to believe denial is appropriate, the bad faith claim based upon denying the claim fails. *Freidline*, 774 N.E.2d at 40.

Nor has the Elliotts shown that State Farm's investigation was in any way conducted in bad faith. The Elliotts complaints surrounding State Farm's investigation are without merit. The seminal bad faith case in Indiana, *Erie*, stated, "the lack of diligent investigation alone is not sufficient to support an award." *Erie*, 622 N.E.2d at 520. Nevertheless, the undisputed facts show that State Farm seems to have conducted a diligent investigation.

As discussed above, generally, when factual disputes exist regarding intent, summary judgment is not appropriate. Here, however, there are no factual disputes regarding State Farm's intent. While the Elliotts have plenty of argument, they fail to cite to a single fact establishing that either Korensky or any other State Farm agent acted with any ill will or improper motive. Instead, the undisputed evidence shows only that State Farm conducted a thorough investigation into the value of the oriental rugs.

Ultimately, while an unfounded refusal to pay policy proceeds may be a breach of good faith, a good faith dispute of a claim is not. *See Hoosier Ins. Co. Inc. v. Mangino*, 419 N.E.2d 978, 987-88 (Ind. Ct. App. 1981)(an insurance company is not required to either pay or litigate at its peril). There has been nothing shown in this case more than a good faith dispute of an insurance claim. Because there are no genuine issues of material fact and State Farm

is entitled to judgment as a matter of law, summary judgment is appropriate on the bad faith claim.

CONCLUSION

For the reasons set forth below, this motion is **GRANTED IN PART and DENIED IN PART**. To the extent State Farm seeks summary judgment on Plaintiffs' bad faith claim, this motion is **GRANTED**. Accordingly, Plaintiffs' bad faith claim is **dismissed**. To the extent State Farm seeks summary judgment on Plaintiffs' breach of contract claim, this motion is **DENIED**.

**DATED: November 8, 2013**        **/s/RUDY LOZANO, Judge**
                                                 **United States District Court**